901 F.2d 1223
 UNITED STATES of America, Plaintiff-Appellee,
v.
Noble Lee SIMPSON, a/k/a Levi, a/k/a Mike Bashara, and a/k/a
John Strudevant, Defendant-Appellant.
 No. 88-1873.
 United States Court of Appeals,
Fifth Circuit.
 May 14, 1990.
 
 Jeffrey W. Hurt, Dallas, Tex. (Court-appointed), for defendant-appellant.
 Merv Hamburg, Atty., Dept. of Justice, Washington, D.C., Marvin Collins, U.S. Atty., Dallas, Tex., for plaintiff-appellee.
 Appeal From the United States District Court for the Northern District of Texas.
 Before GOLDBERG, REAVLEY, and HIGGINBOTHAM, Circuit Judges.
 PATRICK E. HIGGINBOTHAM, Circuit Judge:
 
 
 1
 Noble Lee Simpson raises several issues to attack his conviction of various narcotics offenses. We reject all of his claims, except his contention that his sentence was improperly enhanced. Our decision is for the most part directed by the panel opinion in United States v. Goff, 847 F.2d 149 (5th Cir.1988), reviewing appeals of Simpson's co-defendants. We hold that Simpson was properly convicted of participation in two separate conspiracies rather than a single larger one; that he is not entitled to a new trial based on prosecutorial misconduct; that the evidence was sufficient to support his conviction; and that his trial counsel's performance was not constitutionally defective. The government concedes that the district court improperly enhanced Simpson's sentence because of prior convictions, even though the government had not complied with the procedures for seeking enhancement. We therefore affirm Simpson's conviction, but remand for resentencing without reference to his prior offenses.
 
 I.
 A.
 
 2
 A federal grand jury charged Simpson and 26 others with various narcotics offenses in a twenty-nine count indictment. Count 14 charged Simpson with conspiracy to import marijuana from Belize to Texas; count 15 charged him with aiding and abetting that importation; count 20 charged him with conspiracy to possess that marijuana with intent to distribute it; count 21 charged him with possession of the marijuana with intent to distribute; and count 25 charged him with conspiracy to import cocaine from Columbia to Texas. After a joint trial with all several codefendants, a jury convicted him on each count. The district court sentenced him to concurrent 30 year sentences on counts 14, 15, 20, and 21, and to forty years on count 25, to run concurrently with the thirty year sentences. The district court fined Simpson $20,000 on each count, assessed the mandatory $50 special assessment on each count, and ordered Simpson to serve a special six-year parole term on counts 15 and 21.
 
 
 3
 On the day of sentencing, Simpson's counsel moved to withdraw, and the district court granted that motion a week later. Counsel did not file a notice of appeal before withdrawing, and the time for filing the notice lapsed. A magistrate later recommended that the district court authorize Simpson to take an out-of-time appeal, which the district court did on October 3, 1988. In the meantime, this court resolved the appeals of several of Simpson's co-defendants in United States v. Goff, 847 F.2d 149 (5th Cir.1988).
 
 B.
 
 4
 The indictments and convictions of Simpson and his co-defendants culminated the government's efforts to break a large drug importation ring operating in Texas. The indictment charged several different conspiracies to import drugs from Columbia and Central America into Texas. Simpson was charged with participation in only two of these. The opinion in Goff explains the full scope of the ring's operations.
 
 
 5
 Counts 14, 15, 20, and 21 were based on Simpson's alleged participation in the "Granbury Conspiracy." This was a plan spearheaded by co-defendant Stephen Barrington to fly marijuana from Belize in Barrington's plane and drop it over a site near Odessa, Texas. The government's evidence at trial indicated that Simpson was part of the "ground crew" for this operation--those who were to pick up the marijuana dropped from the plane.
 
 
 6
 The government's evidence further indicated that co-defendants Terry Drewes and James Goff flew the plane to Belize and picked up 45 bales of marijuana, which they dropped over the Odessa site. Simpson, Weldon Eugene Wyatt, and Tom Spratlen strung lights to mark the site. Simpson stayed in touch with the plane via a ground to air radio, and directed Spratlen, who was secretly a government informant, to turn on the lights as the plane approached.
 
 
 7
 Count 25 charged Simpson with participation in the "Maraquita Conspiracy." This was Barrington's plan to import a big load of cocaine from Columbia to Texas in June 1985, using some of the $170,000 proceeds from the sale of the Cessna Titan aircraft used in the previous ventures. Barrington also used some of these proceeds to purchase a Merlin turbo-prop plane for the trip.
 
 
 8
 Originally, the plan was for the plane to depart from Oklahoma City and fly to a spot in Columbia to pick up the cocaine. In May 1985, Simpson took several supplies for the operation to Oklahoma City, and also took the pilot there later that month to meet with Barrington and Spratlen. Simpson was to be part of the flight crew for this venture, so someone recruited new ground crew members, including Simpson's brother-in-law David Duke.
 
 
 9
 Simpson took off with three others from Oklahoma City in mid-June. Several hours into the flight, the plane's instruments began to malfunction, so they returned to Oklahoma City. The conspirators changed plans, deciding the plane should leave from New Orleans instead. Simpson, believing the Merlin was unsafe, refused to fly in it again, and, according to the government's evidence became part of the ground crew in Odessa. The flight crew took off from New Orleans on June 24, but made an abortive landing in Maraquita, Columbia, where they were arrested. According to the government's witnesses, Simpson remained with the ground crew for several days, trying to ascertain the fate of the flight crew.
 
 II.
 A.
 
 10
 Simpson argues that his conviction on the conspiracy charges was defective in three respects. First, he says the government's proof showed the Granbury Conspiracy and the Maraquita Conspiracy were actually parts of one large conspiracy. Thus, he argues, he could not have been convicted of separate participation in each, consistently with the Double Jeopardy Clause.
 
 
 11
 His co-defendants made this argument more broadly on the previous appeal, contending that all of the conspiracies charged in the indictment were shown at trial to have been merely parts of a larger conspiracy. Indeed, the government did attempt to paint all of the drug smuggling ventures as part of Barrington's efforts to import one big load of cocaine from Columbia into Texas. The court therefore analyzed all of the charged conspiracies in relation to one another, in terms of the factors set out in United States v. Marable, 578 F.2d 151 (5th Cir.1978), to determine exactly how many conspiracies the government proved. The court determined that the government proved only two. The first incorporated the Granbury Conspiracy and another charged conspiracy known as the Tye Conspiracy. The second was the Maraquita Conspiracy. United States v. Goff, 847 F.2d at 166-167. As these were the only conspiracies with which Simpson was charged, this argument fails.
 
 
 12
 Simpson's second argument is also based on the Double Jeopardy Clause. He says that he should not have been charged with conspiracy to import the Granbury marijuana in Count 14, and with conspiracy to distribute that marijuana in Count 20. In Goff, Simpson's co-defendants made the same argument about Counts 9 and 11, which charged them with these same offenses with respect to the Tye marijuana. As the court there pointed out, it is well settled that the government can impose a separate punishment for each statute a conspirator has agreed to violate, even if there is only one agreement, provided Congress has authorized such punishment. Congress elected to do this with 21 U.S.C. Secs. 846 and 963, the statutes involved here. 847 F.2d at 169 (citing Albernaz v. United States, 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981); United States v. Kalish, 690 F.2d 1144 (5th Cir.1982), cert. denied, 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 958 (1983)).
 
 
 13
 Finally, Simpson points out that in Goff, the court remanded for resentencing of the defendants convicted separately of the Tye and Granbury Conspiracies. The court said that, to comply with the Double Jeopardy Clause, the government must elect to have them sentenced only on either the Tye Conspiracy (counts 9 and 11) or the Granbury Conspiracy (counts 14 and 20), not both. The government chose to have them sentenced on the Tye Conspiracy, and dismissed the Granbury Conspiracy counts. Simpson argues that this means the government had to dismiss counts 14 and 20 against him as well. This argument fails because Simpson was not charged with the Tye Conspiracy.
 
 B.
 
 14
 Simpson points to five asserted instances of prosecutorial misconduct in the closing argument which he says entitle him to a new trial. They are: (1) improper bolstering of Tom Spratlen's testimony; (2) improper attacks on the defendants' attorneys; (3) improper bolstering of the government's case by emphasizing the prosecutor's position and by asserting the views of other government agencies concerning the defendants' guilt; (4) the prosecutor's expression of his opinion as to guilt and his reference to all of the defendants as "crooks;" and (5) misstating the evidence about Simpson's departure from Belize during an unrelated drug venture. Simpson also argues that, even if none of these errors alone warrants reversal, their cumulative effect requires it. Simpson's co-defendants raised the first four instances in Goff, so only the fifth is new.
 
 
 15
 When a defendant objects to closing argument, the trial court commits reversible error in overruling the objection only if the portion of the argument objected to is both inappropriate and harmful to the defendant. United States v. Iredia, 866 F.2d 114 (5th Cir.1989). Improper argument harms the defendant if it affects his substantial rights. United States v. Lowenberg, 853 F.2d 295 (5th Cir.1988), cert. denied, --- U.S. ----, 109 S.Ct. 1170, 103 L.Ed.2d 228 (1989). To determine whether the argument affected the defendant's substantial rights, we examine (1) the magnitude of the statement's prejudice, (2) the effect of any cautionary instructions given, and (3) the strength of the evidence of the defendant's guilt. Id. at 302. As we will not set a conviction aside if the prosecutor's conduct did not contribute to the guilty verdict, this analysis is equivalent to review for harmless error. United States v. Cardenas, 778 F.2d 1127 (5th Cir.1985); United States v. Beckett, 706 F.2d 519 (5th Cir.1983).
 
 
 16
 If the defendant has not objected to the portion of the closing argument he challenges on appeal, we review only for plain error. Plain error is obvious, substantial, and so basic and prejudicial that the trial lacks the fundamental elements of justice. United States v. Davis, 831 F.2d 63 (5th Cir.1987).
 
 
 17
 In Goff, the panel noted that the district court and the parties agreed that an objection by one defendant would be considered an objection by all, unless expressly disavowed. 847 F.2d at 162, n. 15. The court determined that the first four instances of prosecutorial misconduct were improper and prejudicial, and that the district court gave no curative instruction on the misconduct objected to at trial (instances (1), (2), and (4)). 847 F.2d at 161-166. The court determined, however, that the misconduct objected to was harmless in light of the evidence against the appellants, and that the unobjected-to misconduct (instance (3)) did not constitute plain error. 847 F.2d at 178.
 
 
 18
 We are of course bound by the plain error determination, and the determinations that the prosecutor's misconduct in these instances was improper and prejudicial. Therefore, we need only determine whether the objected-to misconduct was harmless as to Simpson. We conclude that it was. In addition to Spratlen, several witnesses placed Simpson at the scenes of the crimes with which he was charged. The evidence overwhelmingly indicated that he was more than a minor player in both conspiracies, if not indeed a major player.
 
 
 19
 The fifth alleged instance of misconduct refers to a remark the prosecutor made about a trip Simpson and his co-defendant Goff made to Belize. This trip was not a part of either of the conspiracies charged. In February 1985, they flew from Sweetwater, Texas to Belize in Goff's plane, planning to pick up 1,555 pounds of marijuana to bring back to Texas. Belizean law enforcement officials arrested them at the pick-up point. Another co-defendant, Drewes, told George Gantt, a government informant, that he paid someone in Belize more than $100,000 to release Simpson and Goff. The D.E.A. dispatched an agent, Reina, to Belize to question Simpson and Goff. Reina held one meeting with them, but when he returned the next day, they were gone. They apparently left without official approval, as the government of Belize has since convicted them in absentia and issued commitment warrants against them. Simpson complains about the prosecutor's paraphrasing of Reina's testimony, in which the prosecutor said Reina saw them in custody one day "and when I [meaning Reina] went back the next day and [sic] they were gone. And wasn't anytime during business hours that they left." Simpson's counsel did not object. Simpson claims this was an improper hint that he had escaped from jail in Belize. He does not contend the remark was irrelevant.
 
 
 20
 We are not persuaded the remark was improper. It was a permissible summary of the evidence given by Gantt and Reina. Even were we persuaded the remark was improper, it would not constitute plain error under the Davis standard.
 
 C.
 
 21
 Simpson complains of two alleged instances of prosecutorial misconduct in other phases of the case. He first claims the prosecutor permitted Spratlen, the government's chief witness, to commit perjury. Second, he claims the prosecutor failed to disclose exculpatory evidence, by failing to provide him with certain hotel receipts.
 
 
 22
 His first claim is based on an alleged conversation involving Simpson, his brother-in-law David Duke, their attorneys, Spratlen, the prosecutor, and others. According to Simpson, Duke told the prosecutor that the statement in the indictment that Simpson had recruited Duke and another man to be part of the ground crew for the Maraquita Conspiracy was incorrect. Simpson says the prosecutor promised to withdraw the statement from the indictment but did not, and later allowed Spratlen to testify to this alleged falsehood. We are unable to locate a reference to this incident in Spratlen's testimony, or in anyone else's. Simpson points us to none. His argument therefore fails.
 
 
 23
 Simpson's second claim involves some photos the D.E.A. took of him at an Odessa hotel about the time of the Maraquita conspiracy. The agent who took the photos testified that he took them on May 28, 1985. David Duke testified he did not remember having seen Simpson in Odessa in May, so the photos must have been taken in June. Simpson claims that the government had hotel receipts that would have confirmed Duke's testimony, and would in fact have shown that he was only at the hotel after the flight crew had been arrested in Columbia.
 
 
 24
 Simpson claims the hotel receipts were exculpatory because when he refused to fly to Colombia, he withdrew from the conspiracy, and the D.E.A. photos were the government's only evidence to the contrary. He assumes that the conspiracy ended with the arrest of the flight crew, and says the hotel receipts would have helped him show his presence at the hotel was unrelated to the conspiracy.
 
 
 25
 We think the evidence was not exculpatory; indeed, it tended to inculpate Simpson. As the Goff panel pointed out, a conspiracy does not end with the arrest of some of the conspirators. United States v. Kalish; United States v. Michel, 588 F.2d 986 (5th Cir.), cert. denied, 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 32 (1979). Thus, proof that he was at the hotel only after the arrests does not itself tend to exculpate Simpson. Further, Spratlen testified that Simpson, while at the hotel, made efforts to ascertain the fate of the flight crew, and Johnny Letcher, a Maraquita ground crew member, testified Simpson was also a member of the ground crew. Therefore, his presence at the hotel, whenever it occurred, tends to inculpate him.
 
 D.
 
 26
 Simpson argues that the evidence was insufficient to sustain his conviction. We think the evidence was sufficient on all counts. There was specific testimony from Spratlen and others that Simpson was part of the ground crew of both operations, and had originally planned to be part of the flight crew of the Maraquita conspiracy. Spratlen testified that Simpson directed the ground crew operations in the Granbury conspiracy, and that he brought supplies to Oklahoma City for the Maraquita conspiracy. Spratlen and Letcher testified he was involved in the Maraquita conspiracy long after his claimed withdrawal. Simpson offered little to contradict this testimony.
 
 E.
 
 27
 Simpson next argues that his trial counsel rendered constitutionally ineffective performance, entitling him to a new trial. Under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a defendant claiming his trial counsel was ineffective must demonstrate that counsel's performance fell below objectively reasonable standards, and that the deficiency caused him actual prejudice (i.e., that the result of the proceeding reasonably might have been different).
 
 
 28
 Simpson points to several alleged failures by his counsel. Counsel failed to investigate Duke's claims that the D.E.A.'s Odessa photos were taken in June, not May. Counsel was absent at certain points in the trial and at sentencing. He failed to object to a photo of Simpson sitting on bales of marijuana in Belize. He failed to object to the presentation of evidence of Simpson's criminal activities other than the charged conspiracies, specifically the trip to Belize. He failed to object to the district court's jury instruction regarding evidence admitted under Fed.R.Evid. 404(b) and was not present during reinstruction on this point. He failed to object to any of the instances of prosecutorial misconduct set out above. Finally, he failed to object to the special parole terms.
 
 
 29
 First, we are persuaded that, as to most of these instances, counsel's performance was not deficient. His failure to investigate Duke's claim was not, because, as we have said, Simpson's presence at the hotel, even if only after the arrests, inculpated him rather than exculpated him. This is so even if he was present only after the arrests. Counsel's absences do not constitute deficient performance. He was absent only four times: during a bench conference that had nothing to do with Simpson; at the beginning of one day of trial, while the court conferred with another attorney about problems with an interpreter; at the beginning of another day, when he and two jurors were delayed by inclement weather, and no testimony was given in his absence; and during the 404(b) evidence reinstruction, concerning evidence that had nothing to do with Simpson.
 
 
 30
 Goff's counsel objected generally to any evidence about the trip to Belize. As we have said, the district court agreed before trial to accept objection by one counsel as having been made on behalf of all other defendants, unless expressly disavowed. There thus was no need for Simpson's counsel to object. This of course applies to all of the objected-to instances of prosecutorial misconduct as well, and to counsel's failure to object to the original jury instruction on the 404(b) evidence. Indeed, because the 404(b) evidence had nothing to do with Simpson, his counsel had little if any reason to object.
 
 
 31
 The unobjected-to prosecutorial misconduct--the improper emphasis of the prosecutor's position and the references to other government agencies' opinions of defendants' guilt--did not prejudice Simpson in light of the evidence against him. The failure to object to certain aspects of sentencing is moot, as the government has conceded to a remand for resentencing. See below.
 
 F.
 
 32
 The government concedes that the district court enhanced Simpson's sentence based on prior convictions, even though the government did not comply with proper procedures for seeking an enhancement. The government indicated at oral argument that remand for resentencing was appropriate. We agree. We vacate Simpson's sentence and remand for resentencing without reference to his prior convictions.
 
 
 33
 AFFIRMED IN PART, VACATED IN PART AND REMANDED.