**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**
No. 92-2233

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

FREDDIE OCAMPO ARCE
and HAROLD PINEDA-VELEZ,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Texas
_____
August 3, 1993

Before WISDOM, DAVIS, and SMITH, Circuit Judges.

DAVIS, Circuit Judge:

Freddie Ocampo Arce ("Arce") and Harold Pineda-Velez ("Pineda") appeal their convictions for conspiracy to possess with intent to distribute and for aiding and abetting the possession with intent to distribute of over five kilograms of cocaine, in violation of 18 U.S.C. § 2 and 28 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). We find no reversible error and affirm.

I.

In July, 1991, Carl Fessler, acting as a confidential informant for the DEA, contacted an acquaintance from prison, Juan Sosa, to arrange a purchase of 100 kilograms of cocaine. Sosa testified that he contacted Pedro Gemin, another prison

acquaintance, who invited Sosa to Houston to set up the transaction. While in Houston, Sosa was introduced to Albero Ramos. Ramos, in turn, contacted appellant Pineda.

Sosa went back to Miami for a few days, then returned to Houston when Gemin notified Sosa that part of the transaction was to take place in Houston. Gemin and Sosa met with Fessler and two undercover officers posing as buyers in a hotel and agreed to a sell 50 kilos of cocaine for approximately $500,000. Gemin and Sosa agreed to sell an additional 50 kilos to be delivered in Chicago. After that meeting, Sosa and Gemin met with Ramos. Gemin testified that Ramos called Pineda to tell him that they had seen the money.

On August 7, 1991, Pineda met with Gemin at Wyatt's Cafeteria to arrange the details of the sale. At Pineda's request, Gemin got a car from Ramos, a gold Oldsmobile, to serve as the load vehicle for the cocaine. Gemin dropped off the car, with the keys inside, at the Wyatt's Cafeteria and called Pineda with the license plate number. Pineda was to drop off the car loaded with cocaine at Gemin's residence later that afternoon.

Gemin and Sosa then went to the Marriott Hotel and met Fessler and Officer George Helton, one of the "buyers." They agreed that Helton would accompany Gemin to his home and call Fessler when the cocaine arrived. Sosa would wait with Fessler at the hotel; when Helton called, Fessler was to release the money to Sosa.

An hour and a half later, officers observed a red Sunbird and a gold Oldsmobile approaching Gemin's home. Gemin met Pineda and appellant Arce, whom Pineda introduced as the person in charge, at

2

the front door. Gemin testified that the two men entered the house, and Pineda told Gemin that he had only 35 kilos of cocaine, instead of the promised 50 kilos. After Gemin expressed disappointment and Arce appeared ready to leave, Pineda suggested that Gemin speak to his people about accepting the reduced quantity. Gemin met with Helton in another room, and Helton agreed to accept the 35 kilos. Gemin then took the keys to the Oldsmobile and pulled the car into his garage. After he was shown the cocaine, Helton called Fessler at the Marriott. Law enforcement officers immediately entered the house and arrested the defendants.

Arce, Pineda, Sosa, and Gemin were charged in a two-count indictment with conspiracy to possess over five kilograms of cocaine with intent to distribute and with aiding and abetting in the possession of over five kilograms of cocaine with intent to distribute, in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). After a full trial, a jury convicted Arce and Pineda on both counts. The court sentenced Arce to 235 months imprisonment, five years supervised release, and a special assessment of $100. Pineda received a sentence of 190 months imprisonment, five years supervised release, and a $100 special assessment. Both defendants now appeal their convictions.

## II.

Defendants first challenge the district court's ruling permitting the government to make two peremptory challenges to the jury venire. Pineda and Arce both allege race discrimination in the prosecutor's peremptory challenge of a Spanish-speaking juror. In addition, Pineda argues that the trial court erred in striking

3

for cause another juror who had been convicted for heroin possession. We address these arguments in turn.

## A.

The prosecutor exercised a peremptory challenge to strike Antonio Barajas, a Spanish-speaking venireperson. Pineda and Arce contend that the district court erred in overruling their objection, based on **Batson v. Kentucky**, 476 U.S. 79 (1986), that the strike was racially motivated.

During voir dire, the defense asked whether any member of the panel knew Spanish, and Mr. Barajas indicated that he could understand, read, and speak Spanish. Neither the court nor the attorneys questioned Mr. Barajas further. The prosecutor exercised a peremptory challenge to excuse this juror. In response to defense counsel's **Batson** objection, the prosecutor explained the challenge as follows:

> [T]he reason I struck him was because his employment was only a short period of time. He has been at Anheuser-Bush [sic] for only six months. He was also the only person who indicated, as I recall, that he spoke, was fluent in the Spanish language. I had some concern that if there was any translations to be given that, of course, the jury panel would have to rely on the translation that was given from that was admitted into evidence, and that some concern that perhaps someone who spoke Spanish, they may give a different version of the Spanish in the jury, primarily for those two reasons.

Arce's attorney responded, "We would question that, because the prosecutor had ample time to question the juror. He did not. He chose not to question the juror about whether that could affect or become a factor in this proceeding." The court ruled that "[t]he Supreme Court indicated that that's a legitimate reason for striking someone. I am satisfied that that's a legal reason."

4

The defendants failed to challenge the prosecution's first reason for excusing Mr. Barajas, his short time of employment. Because this reason was not facially race-related and the defense did not dispute that explanation, the district court had no need to rule on its validity.

The Second Circuit has held that a defendant waives objection to a peremptory challenge by failing to dispute the prosecutor's explanations:

> Once the Government has offered reasons for its peremptory challenges, defense counsel must expressly indicate an intention to pursue the **Batson** claim. . . . By failing to dispute the Government's explanations, [defendants] appeared to acquiesce in them. As a result, there was no need for the district judge to make a ruling.

**United States v. Rudas**, 905 F.2d 38, 41 (2d Cir. 1990). By failing to dispute the prosecutor's short-term employment explanation in the district court, defendants have waived their right to object to it on appeal. Mr. Barajas's short time of employment thus stands as an uncontested basis for excusing him, and we need not consider his Spanish language ability as an explanation for the challenge.

B.

Pineda also argues that the district court erred in striking for cause a venireperson who had a prior conviction for heroin possession. Pineda acknowledges that 28 U.S.C. § 1865(b)(5) disqualifies from jury service a person who "has been convicted in a State or Federal court of record of[] a crime punishable by imprisonment for more than one year and his civil rights have not been restored." According to Pineda, however, § 1865(b)(5) unconstitutionally discriminates against convicted felons.

5

We have no trouble concluding that § 1865(b)(5) is constitutional. The constitutionality of § 1865(b) is subject to rational basis review. **See Shepherd v. Trevino**, 575 F.2d 1110, 1115 (5th Cir. 1978), **cert. denied**, 439 U.S. 1129 (1979) (holding that selective disenfranchisement or reenfranchisement of convicted felons is subject to rational basis review). Several appellate courts have upheld § 1865(b)(5) under this standard. **See United States v. Foxworth**, 599 F.2d 1, 4 (1st Cir. 1979); **United States v. Greene**, No. 92-3052, 1993 WL 101848 at *5 (8th Cir. April 8, 1993).

We agree with those courts that excluding convicted felons from jury service does not violate the constitutional guarantee of equal protection. The government has a legitimate interest in protecting the probity of juries. Excluding convicted felons from jury service is rationally related to achieving that purpose.

### III.

We consider next two challenges to the district court's evidentiary rulings. Arce contends the district court erred in admitting drug ledgers into evidence without proper authentication. Pineda argues that the court erred in admitting a codefendant's testimony about a jailhouse conversation between Pineda and Arce.

### A.

Arce contends that the district court abused its discretion in admitting into evidence ledgers reflecting drug transactions between Henry William Nunez, a known cocaine trafficker, and someone named "Fredy." The ledgers reflected drug transactions with "Fredy" on August 5 and August 7, 1991. The government contended that "Fredy" referred to the defendant, Freddie Arce.

6

The August 5 entry, under the name "Fredy," bore the number "2" followed by the date and time, "10 pm." The government offered evidence that an undercover officer purchased two kilos of cocaine at that time from a person who had just obtained the cocaine from an individual driving a car registered to Arce's wife. The second ledger entry reflected the number "35," the date, and "pm"; this entry corresponded to the 35-kilo sale in this case. An officer testified that the two kilos from the August 5th transaction were wrapped similarly to the 35 kilos recovered on August 7th. Police recovered the ledgers from Nunez's home after Arce's arrest.

Arce argues that the evidence was inadmissible for two reasons: the government failed to properly authenticate the ledgers and the ledgers were inadmissible hearsay. We find no abuse of discretion in admitting the ledgers.

Evidence Rule 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." We have stated that

> [t]his Court does not require conclusive proof of authenticity before allowing the admission of disputed evidence. . . . Rule 901 does not limit the type of evidence allowed to authenticate a document. It merely requires some evidence which is sufficient to support a finding that the evidence in question is what its proponent claims it to be.

**United States v. Jimenez-Lopez**, 873 F.2d 769, 772 (5th Cir. 1989). The government may authenticate a document with circumstantial evidence, "including the document's own distinctive characteristics and the circumstances surrounding its discovery." **United States v.**

7

**Smith**, 918 F.2d 1501, 1510 (11th Cir. 1990), **cert. denied**, 116 L.Ed.2d 117 (1991).

The government presented ample evidence in this case to authenticate the drug ledgers. Perry Podaras testified that he worked for Nunez, that these particular ledgers resembled drug ledgers that Nunez maintained, and that the handwriting on the ledgers was similar to Nunez's handwriting. Officers found the ledgers at Nunez's home. This evidence was sufficient to establish that the ledgers were indeed drug ledgers maintained by Nunez.

Arce also argues that the ledgers were inadmissible hearsay. Federal Rule of Evidence 801(d)(2)(E) creates an exception to the hearsay rule for a statement that "is offered against a party and is . . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." **See United States v. El-Zoubi**, No. 92-1128, 1993 WL 187997 at *2 (5th Cir. June 4, 1993). The evidence in this case was sufficient to show under the preponderance standard that Nunez and Arce were involved in a conspiracy to distribute cocaine and that the ledger entries were made in furtherance of that conspiracy. The conspiracy that forms the basis for admitting coconspirators' statements need not be the same conspiracy for which the defendant is indicted. **United States v. Triplett**, 922 F.2d 1174, 1181 (5th Cir.), **cert. denied**, ___ U.S. ___, 111 S.Ct. 2245 (1991). Podaras testified that Arce and Nunez were acquainted and that Nunez had sold cocaine to Arce. Law enforcement officers had seen Arce at Nunez's residence. Arce's delivery of 35 kilos of cocaine to Gemin on August 7, 1991, supports a finding that the August 7 ledger entry was a record of

8

that transaction.  Similarly, the August 5 ledger entry accurately reflects the details of the two-kilo cocaine sale, which involved a similarly-wrapped brick of cocaine delivered by a person driving a gold 1991 Chevrolet Cavalier registered to Arce's wife.  Arce had purchased a 1991 Cavalier several months earlier.  Based on this evidence, the district court did not abuse its discretion in admitting the drug ledgers into evidence.

B.

Pineda argues that the district court abused its discretion in permitting a coconspirator, Juan Sosa, to testify to a jailhouse conversation between Arce and Pineda.  Sosa testified that he overheard Pineda express disbelief that Arce was still responsible for paying for the 35 kilos of cocaine confiscated at the time of the arrest.  According to Sosa, Arce responded that he did have to pay for the cocaine and that he could pay for it in Colombia.

Pineda argues that the court improperly permitted Sosa to testify to the conversation under the coconspirator exception to the hearsay rule, because the conspiracy ended when Arce and Pineda were arrested.  We agree with Pineda that, ordinarily, "a person's participation in a conspiracy ends when the person is arrested for his role in the conspiracy."  **United States v. Goff**, 847 F.2d 149, 170 (5th Cir.), **cert. denied**, 488 U.S. 932 (1988).  Moreover, contrary to the government's contention, there is no evidence that the conspiracy continued after defendants' arrest.  **See United States v. Register**, 496 F.2d 1072, 1078-79 (5th Cir. 1974), **cert. denied**, 419 U.S. 1120 (1975).

The court's other basis for admitting Sosa's testimony, that

the conversation amounted to a declaration against interest under Rule 801(d)(2)(A), is also unpersuasive. If true, the statements would not expose Pineda to any further civil or criminal liability.

We therefore conclude that the district court erred in admitting this evidence. However, the error was harmless. The conversation did tend to show Pineda's and Arce's connection with the cocaine. But the overwhelming evidence in the case already established Pineda's involvement in the cocaine conspiracy. Sosa testified that he knew of the supplier as "Harold" (Pineda's first name). Gemin testified that Ramos contacted Pineda to get the cocaine and that Gemin met with Pineda on more than one occasion to arrange the details of the sale. In addition, Gemin testified that he provided Pineda with the load vehicle for the cocaine. Officers on surveillance observed Pineda, along with Arce, drive up to Gemin's residence at the time of the cocaine deal. Pineda assisted in the 35 kilo sale. When the officers seized the cocaine, Pineda was arrested after he jumped through a window. Thus, we conclude that the hearsay evidence had no substantial effect on the jury's verdict. **See El-Zoubi**, 1993 WL 187997 at *3.

IV.

Pineda next argues that the evidence was insufficient to support his conviction for aiding and abetting possession with intent to distribute at least five kilograms of cocaine. We should reach this conclusion, he argues, because the DEA chemist tested only two of the packages of cocaine, totalling 2026 grams. Pineda's argument is meritless.

We have held that proof of the quantity of drugs involved does

10

not go to guilt or innocence under § 841(a), but rather goes strictly to the sentence. **United States v. Sherrod**, 964 F.2d 1501, 1507 (5th Cir. 1992), **cert. denied**, ___ U.S. ___, 113 S.Ct. 1422 (1993). Since Pineda has not objected to his sentence, his argument lacks merit.

Moreover, the facts are not as Pineda suggests. DEA chemist James Iwamoto testified that, pursuant to DEA policy, he randomly selected two of the 35 blocks of white powder and removed the wrappings to determine the individual blocks' net weight. Iwamoto determined that the average weight of each block was 1,013 grams; from that determination, Iwamoto extrapolated the total weight of the powder to be 40,909 grams. Iwamoto then analyzed samples from eleven of the blocks, selected at random, and determined that the cocaine was 87% pure. Iwamoto further testified that all 35 blocks tested positive for the presence of cocaine. The record amply supports Pineda's conviction.

V.

Pineda finally contends that the district court erred in permitting the prosecutor to express his opinion about the credibility of the government's witnesses. In his closing argument, the prosecutor stated:

> I mean, [the cooperating codefendants] could have really slam-dunked him if they were just there trying to help me; and I don't think counsel for the defense meant to say that, but I feel like I kind of need to say something about it, or if I had put them up to some type of testimony.
>
> They don't pay me enough money to try to prosecute people who I don't believe or who the evidence hasn't shown me are guilty of a crime.
>
> [Defense objection]

11

As to [Assistant U.S. Attorney] Mr. Ray Montgomery, I have known Ray Montgomery since I started practicing law some years ago. I would be afraid--

[Defense objection]

THE COURT: This is argument, counsel, but let's stay within the evidence, please.

Pineda argues that the prosecutor improperly gave his personal opinion about the credibility of witnesses and the strength of the government's case. **See United States v. Di Loreto**, 888 F.2d 996 (3d Cir. 1989). The government contends that the prosecutor was merely responding to defense counsel's repeated insinuations during cross-examination that the prosecution had coached the codefendants' testimony. The government also argues that any error was harmless.

We agree that the defense opened the door to the prosecutor's comments by implying that the government had encouraged the codefendants to testify falsely. Defense counsel made the following comments during cross-examination of Pineda's codefendants:

Q [To Juan Sosa]: The prosecutor hasn't told you anything about what can happen to you by you getting up here on the witness stand and saying exactly what they want you to say?

Q [To Pedro Gemin]: You have spoken with the prosecutor getting ready for this case, and based on that, it's his belief that Mr. Arce and Mr. Pineda are guilty, and that's what he wants you to testify about, correct? . . .

Q But it's [the prosecutor's] desire that you testify to matters that would indicate Mr. Arce and Mr. Pineda are guilty?

[Objection sustained]

Q The only way [the prosecutor] would think that you were lying is if you took the witness stand and said

12

these men were not guilty?

[Objection sustained].

The prosecutor obviously was responding to the defense's suggestions that the government had coached its witnesses.  We have held that "if the prosecutor's remarks were 'invited,' and did no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction." **United States v. Smith**, 930 F.2d 1081, 1088 (5th Cir. 1991) (quoting **United States v. Young**, 470 U.S. 1, 14 (1985)).

Even if the comments were improper, any error was harmless. "[I]mproper argument harms the defendant if it affects his substantial rights." **United States v. Simpson**, 901 F.2d 1223, 1227 (5th Cir. 1990).  In order to determine whether the prosecutor's comments harmed Pineda, we examine (1) the magnitude of the statements' prejudice, (2) the effect of any cautionary instructions given, and (3) the strength of the evidence of Pineda's guilt.  **Id.**

The prosecutor's remarks to which Pineda objects were brief, and when the judge indicated his disapproval, counsel quickly moved to a different subject.  Finally, the evidence against Pineda was strong.  After reviewing the prosecutor's comments in light of the entire record, we conclude that even if the comments were error, they were harmless error.

VI.

For the reasons stated above, we affirm the convictions of Pineda and Arce.

AFFIRMED.

13